Jean Y. JEW, M.D., Plaintiff,

v.

The UNIVERSITY OF IOWA and the Board of Regents of the University of Iowa, Defendants.

Civ. No. 86–169–D–2.

United States District Court, S.D. Iowa, Davenport Division.

Aug. 28, 1990.

Carolyn Chalmers and Robert Zeglovitch, Leonard, Street and Deinard, Minneapolis, Minn., for plaintiff.

Gordon E. Allen, Scott M. Galenbeck, Dean A. Lerner, Asst. Iowa Attys. Gen., Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

VIETOR, Chief Judge.

Bench trial of this case was conducted for 12 days in November of 1989 and 2 days in April and May of 1990. Plaintiff, a tenured associate professor in the College of Medicine's department of anatomy, University of Iowa, asserts a sex discrimination in employment claim under Title VII of the Civil Rights Act of 1964, as amended.[1] Plaintiff contends that sexual discrimination against her, in large measure manifested by, and resulting from, false rumors that she gained favor with her department head by engaging in a sexual relationship with him, resulted in a hostile work environment and denial of promotion to full professor. Plaintiff also contends that the University retaliated against her for pursuing her sex discrimination claims.

### FINDINGS OF FACT

(1) Plaintiff Jean Y. Jew, a medical doctor, is a tenured associate professor in the Department of Anatomy, College of Medicine, at defendant University of Iowa in Iowa City. She is a single woman of Chinese descent.[2] Dr. Jew received her B.S. degree from Newcomb College in 1969 and her M.D. degree from Tulane University in 1973. She accepted a non-faculty appointment as a post-graduate associate at the defendant University of Iowa (hereinafter "University") in the College of Medicine's Department of Anatomy (hereinafter "Department") in 1973, at the age of 24. Dr. Jew received a faculty appointment as an Assistant Professor in 1974. She was granted tenure and promoted to Associate Professor in 1979.

(2) The defendant Board of Regents is an agency of Iowa government created by Iowa Code chapter 262 (1989). It governs the University. Iowa Code § 262.7(1) (1989).

(3) The University has a decentralized administration with a large measure of authority exercised at the collegiate and department level.

(4) The University's College of Medicine (hereinafter "College") has 21 academic departments with five to six hundred faculty members or people with instructional titles. The College employs approximately 2,000 people. There are about 700 medical students in the College and about 600 residents or interns in training at the University Hospitals. Also, hundreds of graduate and undergraduate students from outside the College take courses in the College.

(5) The 21 academic departments in the College have department heads who are responsible for their department's faculty, students and staff. Department heads function as agents of and report to the Dean of the College. The Dean's responsibility for the faculty is exercised through the department heads. Department heads are responsible for seeing that the College's academic mission is fulfilled and the finances of the Department are properly administered. Department heads have control over the departmental budget, salaries,

---

1. Plaintiff also asserted claims of violations of the constitutional equal protection clause against the Dean of the College of Medicine and the former Vice–President of Academic Affairs under 42 U.S.C. § 1983, but those claims were dismissed as barred by the statute of limitations. Ruling and Order, Oct. 31, 1989.

2. Plaintiff does not assert a race or national origin discrimination claim. Her Chinese background is mentioned because it is relevant to some of the evidence.

space, equipment, faculty recruiting, staff, etc.

(6) The Anatomy Department is one of the "basic science" departments in the College. Faculty of the Department are expected to spend a substantial portion of their time in research.

(7) The present Head of the Department is Dr. Joe C. Coulter. Dr. Coulter took over this position in March 1985 from Associate Dean of the Medical School Dr. Rex Montgomery, who served as Acting Head from the summer of 1983 until March 1985. Dr. Terence Williams came to the University of Iowa to head the Department in 1973 and continued as Head until the summer of 1983.

(8) The Head of the Department reports to the Dean of the College, Dr. John W. Eckstein. Dean Eckstein has been Dean of the College during the entire period of Dr. Jew's employment. Dean Eckstein reports to the University's Vice President for Academic Affairs. Dr. Richard D. Remington filled the Vice President position from 1982 to 1988. His predecessor was May Brodbeck.

(9) Dr. Williams was recruited to head the Department from Tulane University, where he was full professor in that university's Department of Anatomy. While he was at Tulane, Dr. Jew was a medical student there. She did considerable research work under Dr. Williams' supervision in his laboratory, and her work won her prizes and a scholarship. She learned the technique of electromicroscopy from Dr. Williams.

(10) Prior to Dr. Williams' appointment in 1973, the Department was split into factions and morale was poor. As it turned out, his appointment did nothing to improve the situation. Drs. Nicholas Halmi, Robert Tomanek and William Kaelber were faculty members in the Department when Dr. Williams began as Head. Their relationship with Dr. Williams was never smooth or cooperative. Dr. Williams had good relations with faculty members that he brought with him to the Department from Tulane—Drs. Ronald Bergman, Paul Heidger and Jew. Dr. Williams projected an image to many that he expected their "loyalty"—that they would get ahead only if they voted his way on departmental matters. Dean Eckstein, in his testimony, characterized the situation in the Department under Dr. Williams as follows:

Well, the biggest complaint was that "Dr. Williams is trying to get rid of me. He's trying to force me out because I won't vote the way he wants. I'm not going to join his team." This was the big thrust, and people were very concerned about what was going to happen to them if they disagreed with Williams.

You see, dissent was not allowed.

Questioning was not allowed, you know, and that's the essence of a university. You're supposed to be able to have an environment in which you could talk about things and disagree and generate new ideas, and that didn't happen in that department.

It was a department that was just paralyzed. People were—didn't know what to do next. They didn't know what their futures held for them. It was stifling. They were worried. They didn't understand all of this stuff and all the, you know, meaning of what was happening to them. It was rather personal; but to me, in looking at it at the time of this review and the beginning of it, it was a terrible place. It was a terrible place to be in a university where that kind of thing was going on.

(11) Throughout her employment at the University of Iowa, Dr. Jew has worked closely with Dr. Williams as a research collaborator. They have co-authored numerous scientific publications and continue to collaborate as research scientists. (Dr. Jew has also collaborated with other female and male scientists.)

(12) The professional relationship between Dr. Jew and Dr. Williams has been close for many years. A good social friendship also developed between Dr. Jew and Dr. Williams and his wife, Dr. Glenys Williams, who is a full professor in the College of Medicine's Department of Family Practice. There has never been a ro-

mantic or sexual relationship between Dr. Jew and Dr. Williams.

(13) Not long after Dr. Jew came to the Department, communications began to circulate suggesting a sexual relationship between her and Dr. Williams by which she had gained favorable treatment within the Department, and otherwise denigrating Dr. Jew.

(14) Cartoons and pictures were posted on the door and wall outside Dr. Halmi's laboratory at various times between 1973 and 1980. These cartoons were sexually suggestive. Handwriting on them referred to Dr. Jew and sometimes Dr. Williams. Dr. Halmi was among the most senior of the Department's faculty and had held administrative responsibilities in the Department prior to 1973. Because of his position, faculty members and students in the Department frequently came to Dr. Halmi's office and passed the posted cartoons. Testimony established that these cartoons appeared throughout the period 1973 through 1980, and remained posted for days at a time. Dr. Jew saw some of these when they were posted, and was embarrassed and ashamed.

(15) Dr. Tomanek, a faculty member at the time Dr. Williams assumed the headship, initiated a pattern of sexually denigrating speech about Dr. Jew as early as 1973. From 1973 to 1986, Dr. Tomanek repeatedly initiated discussions with Department faculty and staff in which he speculated about, or stated that there was, a sexual relationship between Dr. Jew and Dr. Williams. Among other sexually-related inquiries and statements, he told faculty, graduate students and staff members of the Department, sometimes in locker room language, that Dr. Jew had been observed having sexual intercourse with Dr. Williams in Williams' office, that she was a "slut," that she and Dr. Williams were having an affair, that they had been seen coming out of a motel together, and that Dr. Jew had received preferential treatment based on a sexual relationship with Dr. Williams.[3]

(16) In January of 1979, Dr. Kaelber, in a drunken outburst, yelled sexual epithets at Dr. Jew as she walked down a hall in the Department, calling her a "slut," "bitch," and "whore." In the fall of 1983, Dr. Kaelber again referred to Dr. Jew as a "whore." He made this statement to another full professor, Dr. Bergman, shortly before the full professors, including Dr. Kaelber and Dr. Bergman, were to evaluate Dr. Jew for promotion to full professor. Dr. Kaelber was not intoxicated on that occasion.

(17) Sometime after 1980, Dr. Jerry Maynard told people in the Department a "joke," which is best described by Dr. Maynard's own testimony about it:

Q. Dr. Maynard, there's been testimony in this trial that you referred to Dr. Jew as a chink in front of other individuals. Did you do this?

A. No, I did not. I have been accused of that, and I will vehemently deny it to this day. And there was—May I explain this?

Q. I want you to tell the Court what you did say or what you did do that you think might have caused people to say this about you.

A. Okay. To me, there's two things involved here. One is I apparently was charged with what I would consider a very malicious racial slur. That did not occur, and I would never do that. I did use the word in a very frivolous situation, and I repeated a joke that was told to me by someone in the department; and I'm sorry, I cannot remember who told me. I thought I knew, and I asked that person, and they said they did not tell me that, so I don't really know who started it. And it was simply a play on words· with no malicious intent at all. And do you want me to repeat it?

---

**3.** On June 13, 1990, an Iowa District Court jury in Johnson County returned verdicts finding that Dr. Tomanek had made statements to others that Dr. Jew and Dr. Williams had been found in a compromising position, and that Dr. Tomanek had failed to prove that the statements were true. The jury awarded Dr. Jew actual and punitive damages against Dr. Tomanek. *Jew v. Tomanek*, No. 49536 (Iowa District Court, Johnson County).

Q. I want you to tell the Judge what you said.

A. Okay. At that time there was a story going around, and it was either—It was in the newspapers. Either Earl Butz or James Watt, I think is the time, made a statement that on his staff, there was no prejudice because he had a black, a woman, two Jews, and a cripple. And that was in the newspapers by one of the federal officials.

And somebody in the anatomy department started—or was going around the anatomy department made a statement that said, "We're even better off than that department, because we have"— And it was entirely a play on words, intended to show the stupidity of that other remark. "We have a black"— meaning Asa Black—"a woman, two Jews"—which, again, was a play on words—meant Dr. Jew and her sister, Evelyn—"and a cripple," because Dr. Williams was walking with a cane at that time. And then somebody said, "And we're even better, because our Jews are chinks."

It was a play on words. It was very frivolous. It may have been stupid, but I may have repeated that story to someone. I can't even name who all I would have said it to. And that I did say in a very frivolous situation. Now, if that is not the incident—

Also, in the summer of 1984, Dr. Maynard came to Dr. Ronald A. Bergman's office and asked: "Where's Terry [Dr. Williams] and his chink?"

(18) At some point between March of 1983 and July of 1986, Dr. James C. Searls stated to Ms. Christina Perry, a clerk typist in the Department, that he had seen Dr. Williams with his hand on Dr. Jew's "butt." In approximately May or June 1986, Dr. Searls told Ms. Perry that Dr. Jew and Dr. Williams were having an affair.

(19) Dr. Halmi described Dr. Jew as the "departmental hatchet woman" to Dean Eckstein in 1975. At some point in the late 1970's, Dr. Halmi, Dr. Thompson and graduate students were discussing arrangements for rooms at the upcoming professional meetings in Louisville, Kentucky. Dr. Halmi said in the presence of the graduate students that he didn't think they would be seeing too much of Dr. Jew because she would be staying with Dr. Williams at the meetings.

(20) In December 1977 or early 1978, Dr. John Oaks told Dr. Heidger at a casual cocktail party that he could produce a witness at his tenure grievance hearing who had observed Dr. Jew and Dr. Williams in sexual intercourse in a small photographic darkroom in the Department of Anatomy.

(21) Dean Eckstein received anonymous writings on University stationary in approximately 1982 in connection with a grievance filed by faculty member Dr. Asa Black. These writings contained explicit sexually derogatory statements about Dr. Jew and were "repulsive" to Dean Eckstein.

(22) Explicit sex-based graffiti about Dr. Jew appeared on the wall of the men's room in the Department when senior faculty were evaluating Dr. Jew in January 1982.

(23) A salacious limerick appeared in the men's room in the Department on November 1, 1983. The limerick suggested a sexual relationship between Dr. Jew and Dr. Williams. Senior faculty evaluated Dr. Jew for promotion to full professor on the very same day.

(24) Rumors of a sexual relationship between Dr. Jew and Dr. Williams circulated outside of the Department. They were widely circulated within the University and the Iowa City community, and also circulated to faculty of other institutions at national professional meetings of anatomists and neuroscientists.

(25) Although Dr. Jew was not immediately aware of many of the specific incidents, she was aware as early as 1974 of a continuing pattern of conduct suggesting a sexual relationship between herself and Dr. Williams. She saw some of the sexual cartoons posted outside Dr. Halmi's office. In 1974 or 1975, Dr. Asa Black told Dr. Jew that Dr. Tomanek had approached him and his wife and asked whether they observed

Dr. Williams' car at Dr. Jew's house, and whether they could see into Dr. Jew's windows and observe whether she was with Dr. Williams. Dr. Williams told her shortly after their arrival at the University that there was talk of a sexual relationship between them. Dr. Jew heard Dr. Kaelber call her sexually derogatory names in public in the Department in 1979 and documented this and the pattern of sexual harassment in a letter to Dean Eckstein in January 1979. Dr. Bergman and Dr. Heidger made her aware of certain derogatory statements in the 1980's. Dr. Williams showed her photographs of anonymous graffiti after her promotional consideration in November of 1983. Written complaints made by Dr. Jew in 1979 and 1982 confirm that she was well aware of the situation. Dr. Jew was hurt, humiliated and ashamed by the incidents, and suffered some health problems because of them.

(26) Dr. Jew did not, by word or deed, invite the type of comments made about her and Dr. Williams. Her close association with Dr. Williams may well have invited comment to the effect that she was on his side in matters of Department policy, but nothing she did or said invited comment that she was having a sexual relationship with him or otherwise improperly influencing him on Department policy matters. Indeed, Dr. Jew has conducted herself throughout her employment at the University as a serious and committed teacher, scholar, and member of the academic community.

(27) Dr. Jew's Department head, Dr. Williams, was aware from the mid–1970's about the sexual relationship rumors.

(28) Dr. Williams told Dean Eckstein about the sexual relationship rumors not long after Dr. Jew's arrival at the University. In the mid–1970's, Dr. Williams told Dean Eckstein that people were calling Dr. Jew at her home to see if she was there. Dr. Williams told Dean Eckstein that people in the Department were trying to do him in and that they were trying to use Dr. Jew in the process. Dr. Williams advised the Dean that Dr. Jew was vulnerable to damage from these statements because she was not then tenured. He advised Dean Eckstein prior to 1979 of the existence of graffiti directed against Dr. Jew. Dean Eckstein received reports throughout the 1970's regarding an alleged sexual relationship between Dr. Jew and Dr. Williams. He was aware in the 1970's that these rumors had spread broadly throughout the University. At the time of the grievance filed by Dr. Oaks in the latter part of the 1970's, Dean Eckstein advised Dr. Williams that Dr. Oaks had said that if he was not given tenure, he would produce a janitor who would testify that he had seen Dr. Williams and Dr. Jew having sex on a sofa. Dr. Williams told Dean Eckstein that this was false and that it was blackmail. He asked the Dean to remove this "false trail." Dean Eckstein acknowledged that the situation was "terrible." Dr. Williams made Dean Eckstein aware of the graffiti regarding Dr. Jew shortly after it appeared in the Department men's room.

(29) Shortly after the incident involving Dr. Kaelber in January of 1979, Dr. Jew submitted a written complaint of sexual harassment to Dean Eckstein.[4] She notified him of Dr. Kaelber's conduct and complained to him of a "pattern of sexual harassment in attempts to discredit my professional and personal reputation." Dr. Jew met with Dean Eckstein and Vice President May Brodbeck at this time to express her concerns. Both Dean Eckstein and Vice President Brodbeck advised her that there was nothing that could be done, and that a single woman has these kinds of problems in a small town, goldfish bowl environment.

(30) In June of 1982, Dr. Jew noted in a letter to Dr. Mark Stinski, a panel member in the grievance proceedings for Dr. Black of the Department, that she had been subjected to sexual harassment and attacks on her personal and professional qualifica-

4. Dean Eckstein and Vice President Brodbeck promptly got Dr. Kaelber, an alcoholic, into an alcoholic treatment facility after the incident.

tions. Vice President Remington reviewed this letter in connection with the Black grievance at the end of 1982 or the beginning of 1983.

(31) In August of 1983, Dr. Williams, at the request of Dean Eckstein, resigned as Head of the Department. He remained in the Department as a professor. Dr. Montgomery was appointed Acting Head, and the turmoil that had prevailed in the Department for so many years began to subside.

(32) Three tenure-track faculty ranks exist in the College: Assistant Professor, Associate Professor, and Professor. The initial faculty appointment in a tenure-track position is Assistant Professor. After five years in rank, an Assistant Professor is considered for tenure and promotion to Associate Professor. If not recommended and approved for tenure, an Assistant Professor must leave the department and seek an appointment elsewhere.

(33) In contrast to the tenure decision, the decision on promotion to Professor does not implicate the permanency of the candidate's employment, nor does a favorable decision operate to the detriment of other competing candidates. The promotion to Professor is one which carries with it a small monetary raise and a certain amount of status. Associate Professors in the Department have been promoted to Professor in the ordinary course after five or six years in rank as Associate Professor.

(34) The promotion process for an Associate Professor being considered for promotion to Professor was well described by Dr. Montgomery in his testimony:

Persons being considered for promotion were considered in two phases. The first part was the discussion, which I would call the internal discussion. In consultation with the person being considered for promotion, two faculty persons who were senior to them in rank were asked to review the accomplishments of the candidate.

These two faculty members then reported to all persons senior in rank to the person under consideration at a meeting, and the material was dealing with the teaching, with the research accomplishments, and with service, so that these three items were discussed openly; and a decision was then made at the end of that discussion whether we should proceed with consideration of the candidate for promotion.

Were that to be in the affirmative, or the majority of the people thinking that should be the case, then I would ask the candidate for the names of external reviewers of their work, and I would also ask the faculty for similar names.

And from those two groups, I would choose three from each group. These people would then be sent the University regulations and criteria for promotion and would be asked for their comments.

On the receipt of all of those, the faculty would then get back together, and a discussion would be made about the promotion.

This vote, which would be taken on the promotion, would be advisory to the head of the department, who could take the advice or not take the advice for the promotion.

And the head would then recommend appropriately, in his or her opinion, the recommended—make recommendation to the dean, who would then consider this matter with the executive committee of the college.

That committee would advise him whether they would agree with the promotion or not. And he, again, could take their advice or not; and if he was smart, he would say why he did not if he did not.

And then the recommendation goes from the dean to the vice president for academic affairs, who then agrees or does not agree. And upon appropriate agreement, sends it forward to the board of regents, who are the only people who can really make a promotion.

(35) The promotional process described in the preceding paragraph was implemented in the fall of 1983 for Dr. Jew. If a promotion to Professor had resulted, the promotion would have been effective in the summer of 1984, five years after her pro-

motion to Associate Professor. Drs. Williams and Heidger reviewed her accomplishments and reported to the Department's full professors, who met on November 1, 1983.

(36) The professors voted 5 to 3 to deny Dr. Jew promotion. Drs. Williams, Heidger and Bergman voted "yes." The professors who voted "no" were Drs. Tomanek, Kaelber, Frank Longo, Ramesh Ghalla and Gary Van Hoesen. As Acting Head of the Department, Dr. Montgomery moderated the discussion but did not vote. The Head votes only to break a tie. Dr. Montgomery testified that if there had been a tie vote in Dr. Jew's case, he would have voted in favor of advancing Dr. Jew's credentials to the next step in the promotion process.

(37) Evaluation of faculty in the College and the Department for promotion to Professor is based upon three criteria: (1) teaching; (2) research and publications; and (3) service to the institution and the profession. All professors agreed that Dr. Jew fulfilled the teaching and service criteria. Those who voted "no" gave as their reason their opinion that Dr. Jew had not established her "independence" in the area of research and publications.

(38) The conduct and attitude toward Dr. Jew of two of those who voted "no," Drs. Tomanek and Kaelber, has already been noted, including Dr. Kaelber's reference to Dr. Jew as a "whore" in a fall, 1983, discussion with Dr. Bergman about persons up for promotion. Additionally, shortly after the promotion deliberations, Dr. Tomanek stated to Dr. Bergman that they had the votes and could do whatever they pleased. Dr. Tomanek also told Dr. Bergman that "women and blacks don't have any trouble getting jobs."

(39) Another professor who voted "no," Dr. Longo, made a statement during the faculty discussion on Dr. Jew's promotion to the effect that "women and blacks have it made." While Dr. Longo denies making this comment, he admits making a statement to the effect that if Dr. Jew wanted to obtain national recognition, she should have taken advantage of special programs designed for women and minorities to foster their career development.

(40) Another professor who voted "no," Dr. Van Hoesen, commented during the promotion deliberations that Dr. Jew received many more advantages than he had received.

(41) Research productivity is judged by the quality of research, the number of publications and the quality of the journals, whether the candidate has independent grant support as a principal investigator, the amount of independent grant support, service on peer review committees and training of graduate students.

(42) At the time of her performance evaluation and promotional consideration in November 1983, Dr. Jew had authored or co-authored numerous published or in-press articles and book chapters, 24 of which had resulted from work carried out at the University of Iowa. All of the articles were published after a competitive peer review process in prominent research journals.

(43) At the time of her performance evaluation and promotional consideration in November 1983, Dr. Jew had received, as principal investigator, two grants from the National Institutes of Health and one grant from the National Science Foundation. Dr. Jew had been invited to present her work at international symposia and at numerous national scientific conferences.

(44) Dr. Jew had served as a manuscript reviewer for three major national journals by November 1983—*Archives of Neurology, Experimental Neurology,* and *Physiology and Behavior.* By November 1983, Dr. Jew had been selected to serve as a member of a panel for the Association of American Medical Colleges in an analysis of the Medical College Admissions Test. By November 1983, Dr. Jew had been selected as a grant reviewer for the March of Dimes Birth Defects Foundation.

(45) By November 1983, two graduate students, Bang Hwang and Dennis Healy, had achieved their Ph.D.s under Dr. Jew's direction. By November 1983, six other predoctoral and postdoctoral students had studied or were studying in Dr. Jew's laboratory.

(46) As noted in paragraph 37, the primary criticism of Dr. Jew's research record by those faculty who voted against her promotion was that she had not demonstrated the requisite independence of scholarship. University witnesses cited Dr. Jew's longstanding collaborative relationship with Dr. Williams. The written report that was signed by the senior faculty who voted in the negative in the fall of 1983 suggested that Dr. Jew seek new collaborations. This report also suggested that Dr. Jew had not concentrated on a single theme of research which would have led to more national and international recognition.

(47) None of these reasons were identified during Dr. Jew's previous developmental evaluation from the senior faculty in January of 1982. The review did not raise any questions about the independence of Dr. Jew's scholarship, the need to seek new collaborators, or the lack of a single focus in Dr. Jew's research program. The comments of the faculty, including Drs. Longo and Van Hoesen were: "Research: Is on course except for funding. Reviewers anticipate you being able to get funding in your present research area or a new area. Effort to get funding should remain a high priority. Graduate student training is above average." Subsequent to the Developmental Evaluation in January 1982 and before her consideration for promotion to Professor in November 1983, Dr. Jew secured funding from the National Science Foundation for a three year-period as principal investigator, in the amount of $150,000.

(48) Longstanding collaborations among faculty and participation in multi-authored papers are common and expressly encouraged by the College of Medicine and major funding sources. Collaboration with other faculty does not negate the independence of a research scientist. With respect to evaluating independence, faculty rely in part on the opinion of senior collaborators regarding the independence of a faculty member's contribution to a collaborative project. During the senior faculty's deliberations in November of 1983, Dr. Williams presented a detailed statement attesting to Dr. Jew's independent scholarship on their collaborative projects.

(49) Witnesses offered by both parties testified that independence of scholarship is demonstrated by principal investigator status on grants from the National Institutes of Health or the National Science Foundation and invitations to present at national and international scientific conferences. Dr. Jew demonstrated at trial that she had a sustained record of independent grant funding from the National Institutes of Health and the National Science Foundation, and that she had been invited to present her work on numerous occasions.

(50) Some witnesses criticized Dr. Jew's lack of independence because she was not the first author on many of her publications. However, testimony established that there are numerous conventions for name placement in multi-authored papers. First authorship is not synonymous with principal authorship. In England, where Dr. Williams is from and received his training, the convention is that the name of the senior faculty member in charge of the laboratory appears first on the publication, regardless of the relative contribution of the scientists.

(51) Dr. Jew complained of a pattern of sexual harassment to the University's Office of Affirmative Action and to Dean Woodward, Associate Dean of Faculty, following her promotion denial in November of 1983. These individuals took no action. Dr. Jew then met with Vice President Remington. She informed him of the pattern of sexual harassment against her. Vice President Remington had overall responsibilities in the area of affirmative action at the University in 1983 and 1984, including prevention of sexual harassment. Vice President Remington did not take any investigative or corrective measures following this meeting.

(52) Dr. Jew then lodged a formal written complaint of sexual harassment with Vice President Remington through her counsel on January 12, 1984.

(53) The University treated the January 1984 letter by Dr. Jew's counsel as a formal complaint of sexual harassment. Ms.

Julia Mears, assistant to the President, responded to the complaint by correspondence of January 27, 1984. She informed Dr. Jew that Dr. Remington and Dean Eckstein would appoint a faculty investigative panel after consultation with Dr. Jew to investigate her complaint and recommend administrative action. This investigative panel was within the scope of the University's existing human rights policy.

(54) In Ms. Mears' letter, the University requested that Dr. Jew provide an "assurance" that she would "not commence any other action, administrative or otherwise, related to these allegations." The University's sexual harassment policy contained no provision requiring a complainant to give such assurances as a condition of obtaining an investigation of a complaint of sexual harassment. The parties subsequently agreed to proceed with the investigation without compromising the legal rights of either party, and on April 6, 1984, Dr. Jew filed her administrative complaint with the Equal Employment Opportunity Commission (EEOC) alleging sexual harassment, including discrimination in consideration of her promotion to full professor.

(55) Following receipt of the University's January 27, 1984, response, Dr. Jew's counsel and Ms. Mears conferred regarding the mechanics of the investigative panel and the membership of the panel.

(56) Vice President Remington was responsible for selecting the faculty members to serve on the investigative panel. Professor Nancy Hauserman, who had a legal background, was appointed chairperson. Vice President Remington wanted panel members who were familiar with the work environment in the College of Medicine, so Drs. Hansjoerg Kolder and Mark Stewart, both full professors in the College of Medicine, were appointed. Vice President Remington was personally satisfied that the panel members were free of bias and that they were sufficiently distinguished and credible to do a good job.

(57) Vice President Remington provided the panel with the services of a court reporter because he wanted sworn testimony

and a record of what happened before the panel. He also appointed Laura Douglas, a lawyer and the University's Affirmative Action Officer, as a technical advisor to the panel.

(58) Vice President Remington provided the panel with a written "charge" on August 27, 1984. This document contained the questions that he wanted the panel to address to insure that he received the information that he needed to make an appropriate administrative decision. He personally worked on developing the charge in consultation with other members of the University administration. Dr. Jew's counsel had input.

(59) The panel members met frequently during the period August through November 1984. They discussed the investigation process that they would follow and determined what witnesses were necessary to investigate Dr. Jew's complaint and respond to their charge. The panel took sworn testimony in the office of the University President from 17 witnesses on August 28, 29 and 30, and September 25, 1984. The witnesses included Dr. Jew, Dr. Williams, Dr. Tomanek, Dr. Kaelber and numerous other faculty from the Department as well as administrators. A transcript of the proceedings was prepared at the close of each day's testimony and made available to the parties.

(60) On November 27, 1984, the panel members submitted a unanimous written report containing their factual findings and their recommendations for administrative action. The panel concluded that Dr. Jew had been defamed and harassed because of her sex and that immediate administrative action should be taken on her behalf.

(61) The panel made a number of specific findings about the conduct that had occurred. The panel concluded that statements were made in the University community and beyond to the effect that Dr. Jew was involved in a sexual relationship with Dr. Williams. The panel found that graffiti and anonymous letters to University personnel impugned Dr. Jew's moral character. The panel noted that Dr. Tomanek was repeatedly identified as the initiator of

much of the offensive speech, and that it had reason to believe that he was an initiator of the defamatory remarks. The panel found that Dr. Kaelber publicly defamed Dr. Jew and that his negative attitude toward Dr. Jew was independent of his sobriety. The panel found that the treatment which Dr. Jew experienced was harassment and was related to her sex.

(62) The panel also made specific findings regarding the effect of this conduct on Dr. Jew. The panel found that the incidents of harassment and defamation tainted Dr. Jew's work environment and disrupted her privacy. The panel concluded that the harassment had a destructive effect on Dr. Jew's professional and personal reputation, both locally and nationally. Finally, it found that it was unlikely that either Dr. Tomanek or Dr. Kaelber could judge Dr. Jew objectively.

(63) As requested in its charge, the panel made specific recommendations for administrative action. The panel recommended, among other things, that the Vice President, the Dean and the Department Head arrange for meetings with faculty, staff and graduate students of the Department to inform them of the panel's findings and of the expectations for resolution of the problem. The panel recommended that these administrators make clear to the faculty of the Department that no further harassment would be tolerated, and that they should not encourage harassing statements outside the Department. The panel also recommended that these three administrators meet with Dr. Tomanek and Dr. Kaelber in order to tell them to cease and desist any harassment of Dr. Jew, and to inform them of the consequences of persisting. In addition to this administrative action, the panel recommended several other steps, including: (1) immediate steps to ascertain the authors of the anonymous letters and graffiti; (2) immediate issuance of a strong public statement by the President of the University affirming the University's commitment to a workplace free of sexual harassment; and (3) a public statement by the University exonerating Dr. Jew, the exact content to be reached by mutual agreement of the parties.

(64) The following University administrators read and discussed the panel's written report: Vice President Remington; Dean Eckstein; Mary Jo Small, the Associate Vice President for Finance and University Services, whose responsibilities included affirmative action; Ms. Mears; and David Vernon, a law professor. None of the University's administrators asked the panel to undertake any further investigation or to provide any clarification or augmentation of their written findings. The transcript of the proceedings was available to Vice President Remington, Ms. Mears and Dean Eckstein, but none of them read it in its entirety.

(65) The University took no overt action in response to the panel report until March 20, 1985, when a handwriting analyst was retained to examine the anonymous graffiti and notes and known handwriting samples of 83 individuals. The handwriting analyst reported to the University on August 14, 1985, that a handwriting sample of one who was not a faculty member was the most likely match to the anonymous writings, and asked for further exemplars from that individual. The University did not supply these exemplars until December of 1988, over three years later.

(66) Dr. Coulter became Head of the Department in April 1985.

(67) The University utilized a Business College Professor, Anthony Sinicropi, who does independent work as an arbitrator, to mediate with the University and Dr. Jew. Mediation meetings were held in October of 1985, but to no avail.

(68) On October 31, 1985, after first obtaining "right to sue" letters, Dr. Jew filed suit against the University and the Board of Regents in Iowa District Court in Johnson County alleging violations of Iowa Code chapter 601A, the Iowa Civil Rights Act. She also named Dr. Tomanek as a defendant alleging that he had slandered her. (See n. 3.)

(69) In early November of 1985, Dr. Coulter met separately with Dr. Tomanek and Dr. Kaelber and presented them with letters, Exhibits 41 and 42, copies of which

are annexed hereto as Appendices A and B. No follow-up meetings were conducted.

(70) On November 1, 1985, Dean Eckstein met with the Department faculty and read to them a prepared statement, Exhibit 37, a copy of which is annexed hereto as Appendix C.

(71) On December 18, 1985, Dean Eckstein proposed in writing that a peer evaluation of Dr. Jew be performed by a committee of tenured professors from outside the Department to be appointed by Dean Eckstein after consultation with Dr. Coulter. This committee would be responsible for seeking outside evaluations and other relevant information as it deemed necessary.

(72) Dr. Jew responded to the proposal on January 6, 1986, and raised several concerns. She pointed out that the proposal did not permit her any role in the appointment of the committee. This was inconsistent with the University's initial response to Dr. Jew's sexual harassment complaint which stated that a collegiate committee "appointed by the Dean, after consultation," would conduct her review. She also pointed out that the proposal left entirely to the committee's discretion whether, and the manner in which, external reviews would be solicited. The University's initial response to Dr. Jew's sexual harassment complaint had indicated that external reviews would be sought after consultation with Dr. Jew. Dr. Jew also pointed out that the University's proposed procedure included no mechanism to ensure that the committee members were not influenced by the defamatory comments that had been made about her.

(73) Neither Dean Eckstein nor any other administrator in the College responded to the specific concerns that Dr. Jew raised, nor did they propose any modification to the review procedure.

(74) In the years following 1985, the University never again proposed a special review procedure for Dr. Jew. The only procedure which the University made available to Dr. Jew was the standard promotion procedure, which involved an initial review by the full professors in the Anatomy Department, which would, of course, include Drs. Tomanek and Kaelber. She has declined to use that procedure.

(75) If Dr. Jew had been granted promotion to Professor in November of 1983, that promotion would have been effective in July of 1984. Effective 1984–85, Dr. Jew would have received a $2,000 promotional salary increase, which would have continued to the present. Benefits to faculty members are calculated at 25% of salary payments.

(76) Prior to filing her 1984 complaint of sexual harassment, Dr. Jew's salary increases had averaged 12.10% annually, which had placed her within the top third of faculty in the Department. After filing her complaint, during academic years 1984–85 through 1989–90, Dr. Jew's merit increase averaged 8.8% annually, which places her at the exact mid-point of the faculty in the Department.

## CONCLUSIONS OF LAW

(Including Some Ultimate Fact Findings)

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer * * * to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

### Hostile Work Environment

The Supreme Court observed in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 66, 67, 106 S.Ct. 2399, 2404, 2405, 2406, 91 L.Ed.2d 49 (1986):

[T]he language of Title VII is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent " 'to strike at the entire spectrum of disparate treatment of men and women' " in employment. *Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 707, n. 13 [98 S.Ct. 1370, 1375, n. 13, 55 L.Ed.2d 657] (1978), quoting *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (CA7 1971).

*  *  *  *  *  *

* * * [A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.

\* \* \* \* \* \*

* * * For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

■ The Eighth Circuit has established a five part test to determine whether a plaintiff has prevailed on a hostile work environment sexual harassment claim. A plaintiff must show:

(1) She belongs to a protected group;

(2) She was subject to unwelcome sexual harassment;

(3) The harassment was based on sex;

(4) The harassment affected a term, condition, or privilege of employment; and

(5) The employer knew or should have known of the harassment in question and failed to take proper remedial action. *Hall v. Gus Construction Co.*, 842 F.2d 1010, 1013 (8th Cir.1988); *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986).

■ I find and conclude that plaintiff has proved by a preponderance of the evidence the five elements of her hostile work environment sexual harassment claim, as set forth by the Eighth Circuit in *Hall, supra.*

As for the first element, it is undisputed that plaintiff belongs to a protected group.

Plaintiff has proved that she was subject to unwelcome sexual harassment based on her sex, satisfying the second and third elements. Some Department faculty members who opposed Dr. Williams engaged in a pattern of verbal conduct which sexually denigrated Dr. Jew. I find that this conduct was directed specifically at Dr. Jew in a concerted and purposeful manner and that it was pervasive over the course of 13 years. I find that the harassment was

sexual both because it was sexual in content and because it was directed at Dr. Jew on account of her sex. The ongoing rumors, which were false, accused her of physically using her sex as a tool for gaining favor, influence and power with the Head of the Department, a man, and suggested that her professional accomplishments rested on sexual achievements rather than achievements of merit. Similarly situated males were not so harassed. While there was one isolated incident of graffiti directed at Dr. Heidger, there was no other evidence that either Dr. Heidger or Dr. Bergman, both of whom were viewed as supporters of Dr. Williams by the opposing faculty, was subjected to a continuing pattern of harassment. The sexual relationship rumors, of course, also implicated Dr. Williams, a male. Unlike the import of the rumors with respect to Dr. Jew, however, there was no suggestion that Dr. Williams was *using* a sexual relationship to gain favor, influence and power with an administrative superior. While some of the harassment of Dr. Jew may have been motivated in part by animosity towards Dr. Williams, it nonetheless remained sex-based harassment of Dr. Jew. Were Dr. Jew not a woman, it would not likely have been rumored that Dr. Jew gained favor with the Department Head by a sexual relationship with him.

I find that plaintiff has proved the fourth element, that the harassment affected a term, condition or privilege of employment. The harassment was severe and pervasive. The damage to Dr. Jew's reputation resulting from the sexual harassment had a concrete impact in her workplace.[5] There was testimony in the trial that reputation is particularly important to an academic. The thrust of the speech and other behavior in this case was to besmirch Dr. Jew's reputation. Dr. Montgomery commented to Dr. Bergman in a conversation shortly after the November 1983 promotion deliberations that Dr. Jew "has probably been hurt more than anyone else in this department on

5. I find that Dr. Jew's "workplace" is, at a minimum, the Department, and may be the College or the entire University. Defendants' contention that her "workplace" is merely her labo-
ratory and on occasion a classroom in which she lectures is far too constricted a view of a university professor's workplace.

evidence nobody has ever documented." The harassment was sufficiently severe and pervasive to adversely affect Dr. Jew's health and well-being. She presented credible testimony that she felt humiliation and shame because she was being portrayed in sexual terms.

The nature of the speech regarding Dr. Jew was highly offensive, and it would be extraordinarily difficult for a reasonable person to work well in the resulting environment. This is particularly so because of the nature of Dr. Jew's workplace, which necessitates interaction with colleagues throughout the University and with students from the Department, the College and other divisions of the University. As Vice President Remington testified, no one "should be expected to put up with that sort of thing. * * * It has no place within a university."

Another way in which the hostility of the workplace was expressed was in connection with Dr. Jew's promotional consideration in the fall of 1983. The same faculty members who were verbally harassing Dr. Jew, Drs. Tomanek and Kaelber, were also evaluating her professional work and voting on her promotion. Those members of the senior faculty who were not active in the harassment had, of course, heard the pervasive rumors.

Plaintiff has proved that her employer knew or should have known of the harassment, and failed to take proper remedial action, the fifth and final *Hall* element. The Head of the Department from 1973 to 1983, Dr. Williams, knew about it. Dean Eckstein knew about it. In 1979, Vice President May Brodbeck learned about it. Her successor, Vice President Remington, learned of it in late 1982 or 1983. Plaintiff expressly complained in writing in January of 1979 about "a pattern of sexual harassment in attempts to discredit my professional and personal reputation." The University's response was that nothing could be done (other than getting Dr. Kaelber into alcohol treatment). The University did nothing until after Dr. Jew's counsel's written complaint of January 1984, and what

was then done was little, and even that was very slow in forthcoming.

Dr. Remington said in his testimony: "I never considered a part of my job description to patrol the bedrooms in Iowa City." That is true, no doubt. What is important to note, however, is that the situation was not merely one of idle gossip about an alleged office romance. The rumor was that a faculty member was sleeping with her department chairman to advance her professional position. That faculty member was complaining to the University that the rumor was false and was damaging her professionally and personally. Meaningful action was required.

The November 27 report of the investigative panel, together with the transcript of the panel's proceedings, constituted the University's investigation of Dr. Jew's complaint of sexual harassment. This investigation found a pervasive pattern of sexual harassment of Dr. Jew. The panel report and transcript certainly put the University on notice that immediate appropriate corrective action was necessary. The panel recommended meetings with Drs. Tomanek and Kaelber for the purpose of admonishing them, meetings with the faculty, staff and students, and a public statement designed to remove the taint to Dr. Jew's reputation.

The University's response, noted at paragraphs 64–74 of the Findings of Fact, failed to amount to prompt, appropriate corrective action. The action it did take was tardy. Most of it came only in response to threatened litigation or after commencement of litigation. The University never explicitly condemned the pattern of sexual harassment, or even identified it as improper sexual harassment. The University's response was ambivalent at best.

Reasonable and effective steps could have been taken immediately which would have been neither extraordinary nor unduly expensive. The panel recommendations might have been followed, or other steps might have been chosen. There was no convincing reason offered by the University for why corrective measures were not

taken.[6] Corrective measures were necessary regardless of whether or not the specific incidents of harassment continued to occur. The damage to Dr. Jew's reputation and the hostility caused by previous incidents continued in the absence of corrective measures in her work environment.

### Failure to Promote

A plaintiff may prove a discriminatory failure to promote claim through *circumstantial evidence* using the formula articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981). Under this analysis plaintiff must make out a *prima facie* case using a flexible formula tailored to the particular type of discrimination challenged and the employment decision at issue. If a plaintiff makes out a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. If the employer does that, the burden of production shifts back to the plaintiff to prove that the purported reason is merely a pretext for discrimination. *Burdine,* 450 U.S. at 248, 101 S.Ct. at 1089. This analysis requires consideration of the employer's articulated reason and the circumstantial evidence suggesting discriminatory motive. The court must determine whether the proffered explanation by the employer is worthy of credence, or if a discriminatory intent motivated the action. The burden of proof remains with plaintiff at all times. *Burdine,* 450 U.S. at 248, 101 S.Ct. at 1089.

If plaintiff proves by *direct evidence* that a discriminatory motive was a motivating factor or played a significant role in an adverse employment decision, then the court need not employ the traditional *McDonnell/Burdine* shifting burdens. Instead, the court may apply the "mixed motive" construct set out in *Price Water-*

house v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See also Perry v. Kunz,* 878 F.2d 1056, 1059 (8th Cir.1989).

Under the "mixed motive" construct, if the factfinder believes the direct evidence of discriminatory motive, plaintiff wins without any further showing, unless the employer is able to convince the factfinder by a preponderance of the evidence that the same decision would have been made even absent the discriminatory factor. If the defendant fails to meet that burden then plaintiff is entitled to a judgment. *Price Waterhouse v. Hopkins, supra; Perry v. Kunz, supra.*

Under *Price Waterhouse,* once the burden of proof has shifted to the employer, the employer's burden is *not* to show that the same decision would have been justified; rather, the employer must show that the same decision *would have been made.* A legitimate reason is not enough—the employer must show that the legitimate reason actually motivated it at the time of the decision, and that the discriminatory factors did not influence the outcome.

■ I find and conclude that plaintiff has proved by a preponderance of the direct evidence that a discriminatory motive, bias against her based on her sex, was a motivating fact or played a significant role in the majority vote of senior Department faculty not to recommend her for promotion to full professor. The sexual bias on the part of Drs. Tomanek and Kaelber is obvious, and it affected their votes. The evidence also shows sexual bias on the part of Dr. Longo, and possibly on the part of Dr. Van Hoesen.

There is room for honest difference of opinion as to the adequacy of Dr. Jew's research and publications record as of November 1983. Impressive expert opinion testimony, pro and con, was presented at the trial on that subject. From all of the evidence on the subject, I find and conclude

---

**6.** The defendants cite the fact that the University was engaged in negotiations with Dr. Jew up until the end of October 1985. That is well and good, but trying to negotiate a full resolution of Dr. Jew's complaints did not preclude the Uni-

versity from taking prompt action to correct the sexual harassment situation its own investigative panel found to exist in its November 1984 report.

that in November of 1983 Dr. Jew was qualified for promotion to full professor. I further find and conclude that defendants have failed to prove by a preponderance of the evidence that a majority of the senior faculty would have voted against recommending Dr. Jew for promotion if the discriminatory factor had been absent. Defendants have also failed to prove by a preponderance of the evidence that if the discriminatory factor had been absent the proposed promotion of Dr. Jew to full professor would have been rejected at any subsequent stage of the promotion process.[7]

### Retaliation

I find and conclude that plaintiff has failed to prove that defendants retaliated against her for pursuing her sex discrimination claims.

### Statute of Limitations

There is no merit in defendants' statute of limitations defense. There was a continuing pattern of sexual harassment from the 1970's through the 300 day period before plaintiff filed her EEOC claim.

### Free Speech Issue

■ There is no merit in defendants' contention that they cannot be held liable because Dr. Tomanek's comments were constitutionally protected free speech. Free speech and academic freedom considerations might preclude Title VII liability if the sexual relationship rumors were true, but I have found that the rumors were not true. Rights of free speech and academic freedom do not immunize professors from liability for slander[8] or their universities from Title VII liability for a hostile work environment generated by sexual-based slander.

---

7. Assuming a failure of plaintiff's *direct* evidence proof of a discriminatory motive, I nevertheless find and conclude that she has made out, by circumstantial evidence, a *prima facie* case of sex discrimination, that defendants have articulated a legitimate nondiscriminatory reason for not promoting her to full professor (inadequate record of research and publication), and that plaintiff has proved by a preponderance of the evidence that such reason is pretextual and

### State Court Verdict

■ At footnote 3, I have noted the state court verdict in favor of Dr. Jew in her slander suit against Dr. Tomanek. In addition to the verdicts mentioned in footnote 3, the jury found that Dr. Tomanek, the defendant in that case, had not proved that his statements were made and communicated in "the scope of his employment." (Had the statements been made in the scope of his employment, no judgment could have been entered against Dr. Tomanek under Iowa law. *See* Iowa Code §§ 25A.2(5)(b), 25A.14(4) and 25A.23, and the state trial judge's Instruction No. 16, attached hereto as Appendix 4.) In the state suit, Dr. Jew contended that Dr. Tomanek's statements were not made in the scope of his employment. Defendants contend that her positions in that case and this case are contradictory, and that she is precluded by the doctrine of judicial estoppel—preclusion by inconsistent positions—from resting her case in any part on the conduct of Dr. Tomanek. Defendants' position is not well taken. Plaintiff has not taken inconsistent positions, as articulated in pages 5–8 of her Response filed on July 23, 1990.

### Plaintiff Prevails

Plaintiff has proved her hostile work environment and denial of promotion claims, and is entitled to judgment on those claims.

### Remedies

"It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

---

that the real reason for rejecting her for promotion was sex discrimination.

8. A professor of a state college or university in Iowa might, however, find immunity under state statutes if he can prove that he spoke his slanderous words while acting within the scope of his employment. *See* Iowa Code §§ 25A.2(5)(b), 25A.14(4) and 25A.23.

In pertinent part, 42 U.S.C. § 2000e–5(g) provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include but is not limited to, * * * hiring of employees, with or without back pay, * * * or any other equitable relief as the court deems appropriate.

The Supreme Court recently, in *University of Pennsylvania v. EEOC*, — U.S. —, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990) (footnote omitted), observed:

> When Title VII was enacted originally in 1964, it exempted an "educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution." § 702, 78 Stat. 255. Eight years later, Congress eliminated that specific exemption by enacting § 3 of the Equal Employment Opportunity Act of 1972, 86 Stat. 103. This extension of Title VII was Congress' considered response to the widespread and compelling problem of invidious discrimination in educational institutions. The House Report focused specifically on discrimination in higher education, including the lack of access for women and minorities to higher ranking (*i.e.*, tenured) academic positions. See H.R.Rep. No. 92–238, pp. 19–20 (1971), U.S.Code Cong. & Admin. News 1972, pp. 2137, 2154–2155. Significantly, opponents of the extension claimed that enforcement of Title VII would weaken institutions of higher education by interfering with decisions to hire and promote faculty members. Petitioner therefore cannot seriously contend that Congress was oblivious to concerns of academic autonomy when it abandoned the exemption for educational institutions.

One of the most significant decisions a university makes is the decision to grant or withhold tenure. (See paragraph 32 of the Findings of Fact.) In that decision the University determines "for itself on academic grounds who may teach." *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in result) (quoting from a statement of a conference of senior scholars from the University of Cape Town and the University of the Witwatersrand, including A. v. d. S. Centlivres and Richard Feetham, as Chancellors of the respective universities). Although tenure decisions are part of the heart of academic freedom, academic freedom does not include the freedom to discriminate against tenure candidates on the basis of sex. *Brown v. Trustees of Boston University*, 891 F.2d 337, 360 (1st Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). The *Brown* Court went on to state that "to deny tenure because of the intrusiveness of the remedy and because of the University's interest in making its own tenure decisions would frustrate Title VII's purpose of 'making persons whole for injuries suffered through past discrimination.' *Albemarle Paper Co.*, 422 U.S. at 421, 95 S.Ct. at 2373."

Dr. Jew is a tenured Associate Professor, so the "intrusiveness" of the remedy of ordering promotion to full professor is far less than ordering a grant of tenure.

Promotion to full professor of a tenured associate professor was recently ordered as a Title VII remedy by Judge Politan in *Bennun v. Rutgers, the State University*, 737 F.Supp. 1393 (D.N.J.1990).

■ In the *Brown* case, the court noted the impracticality of ordering another nondiscriminatory tenure decision, well over eight years after the original decision. I think it would be extremely difficult to now structure a fair promotion review and recommendation process, free from any taint of the discriminatory conduct that has occurred in the past, to determine whether Dr. Jew should be promoted on the basis of her record as of November 1983. She has proved to this court that she was qualified for a promotion then, that sex discrimination was a motivating fact or played a

significant role in the decision not to promote her, and defendants have failed to prove to this court that Dr. Jew would not have been promoted even if the discriminatory factor had been absent. On that record, I am satisfied that the appropriate remedy in respect to the failure to promote claim is to order promotion of Dr. Jew to full professor effective July 1, 1984, with back pay.

I am satisfied that the other relief that I order is also appropriate.

### ORDER FOR JUDGMENT

The following IS ORDERED, ADJUDGED AND DECREED:

(1) Defendants shall promote the plaintiff, Dr. Jean Y. Jew, to the position of full professor retroactively effective July 1, 1984.

(2) Defendants shall adjust plaintiff's salary level to the level it would be at if she had been promoted to full professor effective July 1, 1984, considering the normal promotional salary increase and an annual merit increase of at least 8.8%.

(3) Defendants shall establish for plaintiff all other terms and conditions of employment commensurate with the position of a full professor in the College of Medicine who achieved the rank of full professor effective July 1, 1984.

(4) Defendants shall pay plaintiff back pay from July 1, 1984, to the date of her salary adjustment as a full professor under paragraph (2) above, based on the pay and benefits that she would have received if she had been promoted to full professor July 1, 1984, and received the normal promotional salary increase and annual merit increases of at least 8.8%, together with simple annual interest thereon at 8%.

(5) Defendants shall distribute copies of this Memorandum Opinion, Findings of Fact, Conclusions of Law and Order for Judgment, and copies of the investigative panel's November 27, 1984, written report, to the following persons:

(a) Members of the Board of Regents;

(b) President of the University of Iowa;

(c) The University of Iowa's Vice President of Academic Affairs;

(d) The Deans of all colleges in the University of Iowa;

(e) The Heads of all departments in the University of Iowa's College of Medicine, and all of the present faculty and staff in the Department of Anatomy.

(6) The University shall maintain for five years copies of this Memorandum Opinion, Findings of Fact, Conclusions of Law and Order for Judgment for reading by any member of the University's faculty or staff who may wish to read it. The University need not provide copies to such persons, except at their expense.

(7) The defendants shall comply with the foregoing six requirements of this Order, Judgment and Decree within 45 days of this date.

(8) The defendants shall take all reasonable steps to assure a hostility-free work environment for plaintiff.

If plaintiff seeks attorney's fees as part of costs under 42 U.S.C. § 2000e–5(k), plaintiff shall move for the award of attorney's fees within 30 days of this date, and the motion shall be supported by adequate itemization, as provided by Local Rule 22(a).

### APPENDIX A

### PLAINTIFF EXHIBIT 41

The University of Iowa

Iowa City, Iowa 52242

College of Medicine

Department of Anatomy

(319) 353–5905

November 1, 1985

Dr. Robert Tomanek

Professor

Department of Anatomy

University of Iowa

10550 Bowen Science Building

Dear Dr. Tomanek:

As you know, last year the University convened a panel which was charged with

investigating a complaint made by Dr. Jean Jew that she had been subject to sexual harassment in the form of derogatory statements, anonymous letters and graffiti, all of which had the effect of making her working situation intolerable.

In their report, the Panel drew several negative conclusions about your behavior. Until now the University has been in negotiations with Dr. Jew and her attorney in an effort to determine whether the parties could agree to actions the University might take. No agreement was reached and, as you know, litigation is now pending. Before the litigation was filed, we had proposed to proceed based on our own judgment of the charactor of your behavior.

Specifically, the Panel reached the following conclusions concerning your behavior:

1. "Testimony suggests that Drs. Tomanek and _____ were involved in conversation in which they assailed the moral character of Dr. Jew. Dr. Tomanek is repeatedly identified as the initiator for much of the defamatory suggestion about Dr. Jew."

2. "Based on the testimony of Drs. Tomanek and _____, it is unlikely that either of them could judge Dr. Jew objectively."

3. "Dr. Tomanek was evasive, but the Panel has reason to think that he has been the initiator or one of the initiators of the defamation of Dr. Jew."

4. "Immediate steps should be taken to ascertain the author(s) of the anonymous letters and, to the extent possible, the graffiti. If the author(s) is found, appropriate sanctions should be imposed. Because of their clear involvement in the defamation, Drs. Tomanek and _____ should have individual conferences with the Head of the Department of Anatomy, the Dean of the Medical College, and the Vice President for Academic Affairs. They should be admonished to cease and desist any harassment and defamation of Dr. Jew and should be warned of the consequences of persisting."

We have taken the following steps to ascertain the authorship(s) of the letters and graffiti. Specifically, a handwriting expert has examined these documents and compared them to the handwriting of all employees of the Department during the period in question. His most recent report indicates that, in his judgment, no member of the faculty was responsible for the writing present in the grafitti and/or the anonymous letters.

As I mentioned, litigation is pending. Were it not, I would need to ask you whether or not you are guilty of behavior which had the effect of harassing Dr. Jew. Specifically, I would ask 1) if you were guilty of initiating defamatory statements concerning Dr. Jew? 2) Did you ever follow Dr. Jew or watch her home for the purpose of ascertaining the nature of her personal life? 3) Did you allege to colleagues that she was having an affair with Professor Williams? 4) Did you recently speak with Dr. Bergman or any members of the Department of Anatomy faculty about a graduate student finding Dr. Jew or Dr. Terence Williams in a compromising situation? I would then have asked you, if you engaged in any of these activities, did you have any explanation which I would need to take into account in deciding whether your behavior violated any University policy?

If litigation were not pending, I would also have informed you that the behavior alleged in the Panel's findings could constitute a violation of the Faculty Ethics statement and/or other University policies. Under the circumstances, however, I want to give us both time to consult with attorneys before I proceed further. I will be in touch with you shortly. In the meantime, I would advise that you not discuss this matter except with your attorney. Certainly, I would point out that if you were to make any derogatory statements or engage in inappropriate activities directed against Dr. Jew or others, this would be taken into account in judging your behavior in relationship to any future proceedings.

Sincerely,
(s) Joe D. Coulter
Joe D. Coulter, Ph.D.
Professor and Head

APPENDIX B

PLAINTIFF EXHIBIT 42

The University of Iowa

Iowa City, Iowa 52242

College of Medicine

Department of Anatomy

(319) 353-5905

November 6, 1985

Dr. William Kaelber

Professor

Department of Anatomy

University of Iowa College of Medicine

1-512 BSB

Dear Dr. Kaelber:

As you know, last year the University convened a panel which was charged with investigating a complaint made by Dr. Jean Jew that she had been subject to sexual harassment in the form of derogatory statements, anonymous letters and graffiti, all of which had the effect of making her working situation intolerable.

In their report, the Panel drew several negative conclusions about your behavior. Until now the University has been in negotiations with Dr. Jew and her attorney in an effort to determine whether the parties could agree to actions the University might take. No agreement was reached and, as you may know, litigation is now pending. Before the litigation was filed, we had proposed to proceed based on our own judgment of the charactor of your behavior.

Specifically, the Panel reached the following conclusions concerning your behavior:

1. "Clearly Dr. Kaelber publically defamed Dr. Jew. This panel heard testimony that he was drunk at the time; however, his statements before this Panel were of such a nature that his feelings and pronouncements are thought to be independent of his sobriety."

2. "Based on the testimony of Drs. _____ and Kaelber, it is unlikely that either of them could judge Dr. Jew objectively. The tone of Dr. Kaelber's testimony was bitter and hostile."

3. "Immediate steps should be taken to ascertain the author(s) of the anonymous letters, and, to the extent possible, the graffiti. If the author(s) is found, appropriate sanctions should be imposed. Because of their clear involvement in the defamation, Drs. _____ and Kaelber should have individual conferences with the Head of the Department of Anatomy, the Dean of the Medical College, and the Vice President for Academic Affairs. They should be admonished to cease and desist any harassment or defamation of Dr. Jew and should be warned of the consequences of persisting."

With regard to your alleged behavior, I must ask you whether or not you have at any time been involved in any activities or made statements which had the effect of harrassing Dr. Jew. Specifically: 1) have you made defamatory statements concerning Dr. Jew? 2) have you ever followed Dr. Jew or watched her home for the purpose of ascertaining the nature of her personal life? 3) have you alleged to colleagues or others that Dr. Jew was having an affair with Dr. Terence Williams? 4) have you engaged in other activities or made other statements that could constitute harassment of Dr. Jew? I would then ask you, if you have engaged in any of these activities, do you have any explanation which I would need to take into account in deciding whether your behavior violated any University policy?

I must point out that your behavior alleged in the Panel's findings could constitute a violation of the Faculty Ethics statement and/or other University rules and policies. Also, you must recognize that Dr. Jew has filed a legal action against Dr. Robert Tomanek and the University of

Iowa in regard to alleged sexual harassment by you and others. Therefore, you should give careful consideration to anything that you might say in response to my questions or to any other questions regarding your behavior. Certainly, I would point out that if you were to make any derogatory statements or engage in inappropriate activities directed against Dr. Jew or others, this would be taken into account in judging your behavior in relationship to any future proceedings.

> Sincerely,
> Joe D. Coulter
> Joe D. Coulter, Ph.D.
> Professor and Head

## APPENDIX C

## PLAINTIFF EXHIBIT 37

### Statement to Faculty Members in the Department of Anatomy

#### November 1, 1985

In early 1984 Professor Jean Jew, through her attorney, filed a complaint with Vice President Remington alleging that she suffered sexual harassment and defamation as a result of various activities and statements made by members of the Department of Anatomy. Because of the seriousness of Professor Jew's complaint and our desire to discover, if possible, who was responsible for anonymous letters and graffiti which had appeared in the department, and as well to determine the validity of Professor Jew's specific complaints aimed at several members of the department and College and University Administration, Vice President Remington and I decided to appoint a faculty panel to investigate Professor Jew's complaint.

After several months of negotiations, we were able to agree with Professor Jew regarding the makeup of the panel, which conducted its hearings in the fall of 1984. Hearings were conducted under oath and many of you were called to testify.

In late November the panel issued its report and in the intervening period we have been in communication with Professor Jew through her attorney in an attempt to reach agreement as to the actions the University would take in response to Professor Jew's complaint. The University has also undertaken additional investigations of the handwriting used in the anonymous letters and graffiti, as recommended by the panel.

Late last week the mediator who was assisting us in our negotiations indicated that he believed the parties to be at impasse. Professor Jew filed suit against the University yesterday.

Prior to entering negotiations, we had determined, based on our own judgment and taking into account the panel's report, that it was necessary that we take certain actions to insure that Professor Jew is treated fairly and that no appearance of biased treatment exists. The filing of litigation inhibits somewhat our ability to act, but we believe that certain steps should be taken.

1. We have decided to review Professor Jew's promotion to full professor using a procedure similar to that employed in other special circumstances. Specifically, I will, in consultation with Professor Coulter, appoint a review committee external to the department which will act in lieu of Professor Jew's departmental colleagues in the review process.

2. President Freedman will issue a statement condemning sexual harassment in conjunction with the soon-to-be completed work of the Sexual Harassment Task Force.

3. This meeting gives me an opportunity to make it very clear to all members of the department that Dr. Coulter and I deplore any behavior which violates the University's human rights policy and its Statement on Professional Ethics and Academic Responsibilities.

I also want to report to you that, following receipt of the panel's report and in response to one of their recommendations, we obtained the services of a handwriting expert. We provided him with samples of the handwriting of all faculty employed by the department at any point in the period from 1977 to present. After an initial re-

view, he was able to state definitely that all but 4 faculty members could be eliminated from consideration. Further samples were gathered and a second review conducted. We have recently been informed by our consultant that no member of the faculty did, in his judgment, produce the documents in question or the graffiti.

Let me conclude by restating our commitment to fair and decent treatment for all faculty and staff members. Let me also caution you that any statements which vilify a colleague constitute a violation of the Statement on Professional Ethics and Academic Responsibilities.

It is the policy of the University not to comment on matters under litigation. For this reason you will hear very little from University spokespersons regarding this case. It is now up to the courts to make a judgment in the matter.

### APPENDIX D

### INSTRUCTION NO. 16

"Acting within the scope of the employee's office or employment" means acting in the employee's line of duty as an employee of the state.

An employee acts within the scope of employment when his conduct is of the same general nature as or incidental to the conduct normally performed by the employee. The following factors may also be considered:

1. Whether the employee was furthering the employer's business or interests.

2. Whether the conduct would accomplish a purpose of the employment.

3. Whether the employee intended to accomplish a purpose of the employment.

If an employee's conduct is a substantial deviation from the employer's business or interests, it is outside the scope of employment. If the employee was acting solely in his own interest, he is acting outside the scope of employment. Defendant must prove by a preponderance of the evidence that he was acting within the scope of his employment. If defendant proves he was

acting within the scope of his employment, no judgment can be entered against him or his employer, the State of Iowa.