Dube v. Hadco Corp.                    CV-97-554-SD  02/04/99

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


<u>Kellie Dube</u>


    v.                              Civil No. 97-554-SD


<u>Hadco Corporation</u>


<u>O R D E R</u>


    In this civil action plaintiff Kellie Dube alleges that her employer, Hadco Corporation, sexually harassed her and terminated her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et seq.</u> (1994).  Dube's complaint also contains counts based on defamation and wrongful discharge. Currently before the court is defendant's motion for partial summary judgment, to which plaintiff objects.


<u>Background</u>

    Dube was a waitress at the Passaconaway Country Club where she met Chris Mastrogiacomo, the general manager of Hadco's Derry facility.  Mastrogiacomo and a group of Hadco employees played golf at Passaconaway on a weekly basis.  While he was in the clubhouse after playing golf one evening, Mastrogiacomo informed Dube that he was looking for a new secretary and asked her if she

would be interested. Dube told Mastrogiacomo that her secretarial skills were a bit rusty, but after looking at her resume, Mastrogiacomo told her she was qualified for the job and that the company would provide training. Dube accepted the job.

On her first day, Mastrogiacomo introduced Dube to two Hadco managers who worked at its New York facility. In front of the managers, Mastrogiacomo said to Dube, "'We should take you on a business trip to New York.'" Dube Deposition at 77. In her deposition, Dube stated that although she did not expect her job to require travel, she did not find the suggestion objectionable to her in any way. See id. at 82.

Shortly after beginning work, Dube became aware of a rumor that she and Mastrogiacomo were having an affair. Dube first heard the rumor from Don Torisi, a Hadco manager she knew from the golf course. Mr. Torisi told Dube she was "'gonna hear a lot of stuff that's going on that you're involved with Mr. Mastrogiacomo . . . .'" Id. at 91. Mr. Torisi's advice was, "'Don't listen to any of it because you know that it's not true.'" Id. Shortly thereafter, another management employee, Rod, came into Dube's office and told Dube he thought she should be aware there was a rumor that she was involved with Mastrogiacomo. When Dube later brought up the rumor in a conversation with "another guy that was in the warehouse," that employee responded that he was aware of the rumor. Id. at 96.

2

Dube also spoke to Mastrogiacomo about the rumor.  He responded, "'You are going to just have to listen to all of that . . . but none of it's, we know that none of it's true.'"  Id. at 99.

In August 1995 a Hadco manager named Bob Jordan asked Dube to make hotel reservations for some customers who were traveling from Japan to visit Hadco.  Dube made reservations for the men at the Highlander Inn in Manchester.  Because she was not experienced at making travel arrangements and was not familiar with the Highlander, Dube asked Bob Jordan if she could visit the Highlander.  Jordan told her that it was acceptable for her to do so.  According to Dube, she then informed him that "'there could be a chance that I might bump into [the Japanese visitors] just to see how their flight arrangements were, how their flight went, and how the arrangements were when they got there.  Was everything satisfactory.'"  Id. 115.  Jordan responded that "that was not a problem."  Id.

When she left work that day, Dube went to the Passaconaway Country Club and picked up her roommate, Fiona Peatrie, who was a bartender there.  She then drove to the Highlander.  Dube stopped at the front desk, where a hotel employee verified that the Japanese men had arrived.  Dube then called the men on the house phone to welcome them and make sure they were satisfied with the accommodations.  The man who answered the phone told Dube he would like to come down and meet her.  Both of the men met Dube

3

in the lobby of the hotel. At some point (it is unclear from the record when), Dube's roommate joined her in the lobby. After meeting them, one of the Japanese men asked Dube to recommend a restaurant for dinner. When Dube made a suggestion, the man asked Dube and Peatrie to accompany the men to dinner. Dube initially declined, but her roommate encouraged her to say yes, suggesting it might insult the visitors if they declined the offer.

Dube and Peatrie accompanied the men to Café Pavone in Manchester, where they ate dinner. During dinner the group shared a bottle of wine and exchanged pleasantries. At one point, Dube excused herself from the table to make a telephone call. When she returned, she saw that one of the men had spilled some wine on his shirt. Dube drove the men back to the hotel after dinner. Dube told the men she would drive them to Hadco the next day for their meeting. The following day Dube, who was unable to provide the men with transportation because her car had broken down, explained the situation to Carlos Gutierez, the Hadco manager the men were going to meet that day.

Shortly thereafter, Don Torisi and a group of Hadco managers played golf at Passaconaway. Torisi said to Dube's roommate, who was tending bar, "'You and Kellie should, could run an escort service.'" Id. at 209. Later that week, Debbie Simpson, a Hadco employee responsible for training Dube, approached her to discuss

4

the dinner.  Simpson informed her that there was talk about Dube's running an escort service and told her she "wanted to know what [Dube's] theory and thoughts were on [her] going out for dinner.'"  Id. at 140.  Subsequently Diane Riel-Piatt, the human resources manager, called Dube into her office to investigate the rumors that were circulating.  Riel-Piatt told Dube she had heard the escort service rumor and wanted to get her side of the story.

In the aftermath of the dinner, the incident was discussed by various Hadco managers and human resources employees.  There was concern over the wine that was spilled on one of the men.  Some management employees began describing the incident as a "wet t-shirt contest."  Apparently there was a rumor circulating that Dube had thrown a glass of wine on one of the men so she could see his nipples.

When Mastrogiacomo returned from his trip, he asked Dube to resign.  Dube refused.  She subsequently attended a meeting with Mastrogiacomo and Riel-Piatt, at which Mastrogiacomo informed her that her employment was terminated.  Riel-Piatt told Dube that her job performance was the reason for her termination.  Dube, however, asked if it had to do with the dinner, to which Mastrogiacomo allegedly responded "'Yuh.  Women are not supposed to be accommodating (sic) men.'  And I crossed that line and there is too many things that were going on with rumors and he didn't want me to work there anymore."  Id. at 158.

## Discussion

### 1. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996). The court's function at this stage "'is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  Stone & Michaud Ins. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

The moving party has the burden of establishing the lack of a genuine issue of material fact.  See Finn v. Consolidated Rail Corp., 782 F.2d 13, 15 (1st Cir. 1986).  The court views the record in the light most favorable to the nonmoving party, granting her all reasonable inferences in her favor.  Caputo v. Boston Edison Co., 924 F.2d 11, 13 (1st Cir. 1991).  To survive summary judgment, the nonmovant must make a "showing sufficient to establish the existence of [the] element[s] essential to her case," Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986), and cannot merely rely on allegations or denials within the pleadings.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st

Cir. 1993) (quoting Anderson, supra, 477 U.S. at 256), cert. denied, 511 U.S. 1018 (1994).

2. The Scope of the Charge

Hadco first argues that because Dube's Notice of Charge of Discrimination failed to allege hostile environment sexual harassment, she is precluded from asserting such claims in this case. Prior to filing a civil action under Title VII, an aggrieved party must, inter alia, file an administrative charge with the Equal Employment Opportunity Commission (EEOC).[1] The administrative charge serves the dual purpose of giving the employer notice of plaintiff's charges and providing the agency with information and "an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation." Powers v. Grinnell Corp., 915 F.2d 34, 37 (1st Cir. 1990). The

---

[1]The EEOC charge must be filed within 300 days of the alleged discriminatory act. The relevant statute, in pertinent part, states:

> [I]n a case of unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief . . ., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

42 U.S.C. § 2000e-5(e). This clause is applicable as plaintiff initially filed a charge with New Hampshire Commission for Human Rights (NHCHR).

administrative charge affords "'the EEOC with a "jurisdictional springboard"'" to investigate the alleged discrimination.  <u>Id.</u> at 38 (quoting <u>EEOC v. General Electric Co.</u>, 532 F.2d 359, 364 (4th Cir. 1976) (quoting <u>EEOC v. Huttig Sash & Door Co.</u>, 511 F.2d 453, 455 (5th Cir. 1975))).  Thus "[a]n administrative charge is not a blueprint for the litigation to follow," nor need the wording of the charge exactly predict the subsequent judicial pleading.  <u>Id.</u> Instead, plaintiff's civil claims must merely "come within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'"  <u>Id.</u> at 39 (quoting <u>Sanchez v. Standard Brands, Inc.</u>, 431 F.2d 455, 466 (5th Cir. 1970)).

In this case, the only allegation of sexual harassment in Dube's charge is the statement that, following her dinner with the Japanese men, some of her coworkers "made humiliating comments, such as asking me if I was running an escort service." Charge of Discrimination, Exhibit C attached to Defendant's Memorandum of Law in Support of Motion for Partial Summary Judgment.  Dube, however, supplemented her charge with a factual statement written by her lawyer, which included the allegation that "the rumors around the plant were that Mr. Mastrogiacomo was sleeping with Ms. [Dube]."  Letter from James Donchess to John W. Corrigan, Deputy Director, NHCHR, March 29, 1996), Exhibit 5 attached to Plaintiff's Memorandum of Law in Opposition to

8

Defendant's Motion for Partial Summary Judgment. Her attorney's letter also elaborated on the unwelcome comments her coworkers made following her evening with the Japanese men, and asserted that "the company had a responsibility to stop the disgusting sexual remarks, comments and rumors, not to enhance, enflame, and act upon them." Id. Hadco, however, insists it never received plaintiff's supplemental factual account.

The court finds that Dube's allegations to the NHCHR were sufficient to provide notice and an opportunity for conciliation. The scope of a civil complaint is limited to the charge and "'the investigation which can reasonably be expected to grow out of that charge.'" Powers, supra, 915 F.2d at 38 (quoting Johnson v. GE, 840 F.2d 132, 139 (1st Cir. 1988)). In this case, the agency clearly could be expected to investigate Dube's complaints based upon the rumors as those claims were squarely before it. "An imperfect fit between the EEOC charge and complaint allegations is not fatal as long as Title VII's scheme of agency adjudication in the first instance is not thwarted." Chinn v. City Univ. of N.Y. School of Law, 963 F. Supp. 218, 222-23 (E.D.N.Y. 1997). Although Dube's attorney should have sent a copy of his supplemental letter to Hadco, failure to do so cannot be said to have thwarted Title VII's scheme of agency adjudication. Furthermore, Hadco could have obtained the factual statement from the NHCHR but failed to do so.

9

## 3. Hostile Environment Sexual Harassment

Hadco further argues that Dube's allegations are insufficient to support a claim of hostile environment sexual harassment. Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S. C. § 2000e-2(a)(1). One form of sex discrimination prohibited by Title VII is sexual harassment that results in a "hostile or abusive work environment." Meritor Savings Bank, F.S.B. v. Vinton, 477 U.S. 57, 66 (1986).

Workplace sexual harassment may take either of two forms. "Quid pro quo harassment" consists of promises of favorable treatment or threats of unfavorable treatment calculated to coerce an employee into submitting to unwelcome sexual advances. Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996). "Hostile environment harassment" consists of "offensive gender-based conduct that is 'severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive' and is subjectively perceived by the victim to be abusive." Id. (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

10

The determination of whether a plaintiff has established a hostile or abusive workplace environment requires the court to consider all of the circumstances, but particularly those concerning the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating rather than a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. See Brown v. Hot, Sexy & Safer Productions, Inc., 68 F.3d 525, 540 (1st Cir. 1995), cert. denied, 516 U.S. 1159 (1996) (citing Harris, supra, 510 U.S. at 23). As previously indicated, the relevant factors must be viewed both subjectively and objectively. Id. "Although the harassment need not take the form of sexual advances . . ., the plaintiff is required to establish that the harassment complained of was based on her gender . . . ." Galdieri-Ambrosini v. National Realty & Dev., 136 F.3d 276, 289 (2d Cir. 1998); see also Brown, supra, 68 F.3d at 541.

The question of whether, and to what extent, an employer is responsible for failing to stop sexual rumors is interesting and little explored. Most decisions examining the issue have indicated that rumors can create a hostile work environment. See Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 517 (7th Cir. 1996); Spain v. Gallegos, 26 F.3d 439, 451 (3d Cir. 1994); Jew v. University of Iowa, 749 F. Supp. 946, 958 (S.D. Iowa 1990).

Rumors have been found severe and pervasive enough to create a hostile work environment when they have been accompanied by insults and accusations that the subject of the rumors used the relationship to gain power and the rumors contributed to an adverse employment action. See Spain, supra, 26 F.3d at 451; Jew, supra, 749 F. Supp. at 958. In Jew, for instance, the plaintiff, a medical school professor, was the subject of a rumor that she was having an affair with her department's head. Jew, supra, 749 F. Supp. at 949. The rumor was spread by fellow professors who were in frequent conflict with the department head, a close associate of Dr. Jew. The rumor was accompanied by sexually suggestive and explicit cartoons about Dr. Jew posted on a bulletin board; a salacious limerick about her written in the faculty men's room; derogatory sexual epithets, including "slut," "bitch," and "whore," that were shouted at her by another faculty member; a letter to the university's dean, written on department letterhead, containing explicit derogatory statements about Dr. Jew; and suggestions that her professional accomplishments were more properly credited to her sexual activities than to merit. See id. at 949-53. Although Dr. Jew complained to the university multiple times, nothing was done to stop the harassment, and by a vote of the department members, some of whom were responsible for the harassment, she was denied promotion from associate professor to full professor. See id. Similarly, in the other reported

case finding that sexual rumors created a hostile work environment, the rumors suggested that the plaintiff gained favor through the relationship, which led to resentment and poor relationships between the plaintiff and her coworkers, contributing to a promotion denial. See Spain, supra, 26 F.3d at 448.

Rumors, however, may fail to create an actionable hostile environment because, although their content may be sexual, their effect is often gender neutral. See Pasqua, supra, 101 F.3d at 517; Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1001 n.1 (10th Cir. 1996); Jackson v. Texas A & M Univ., 975 F. Supp. 943, 946 (S.D. Tex. 1996); cf. Jew, supra, 749 F. Supp. at 959 ("[T]he situation was not merely one of idle gossip about an alleged office romance."). By their nature, sexual rumors generally involve two people of opposite sexes. Thus such rumors may be said to affect the male subject of the rumor equally. When rumors are accompanied by sexual epithets and accusations that the female participant in the purported affair was using sex to advance her career, however, they are no longer gender neutral.

In this case, the rumor alleging an illicit relationship between Dube and Mastrogiacomo was not combined with any of the factors that would allow a jury to find that the rumor created a hostile work environment. There is no indication that the rumor was accompanied by derogatory comments and insults; it was more

13

akin to a "mere offensive utterance" than to physically threatening or humiliating conduct.  Brown, supra, 68 F.3d at 540.  The employees who informed Dube of the rumor did not do so in an accusatory manner, but rather told her that they did not believe the rumor.  There is also no evidence that the rumor caused Dube's coworkers to become hostile toward her.  Indeed, not only is there scant evidence to support the proposition that Dube's work environment was hostile and abusive from an objective point of view, but there is also little evidence that Dube felt the rumors created a hostile environment.  Despite Dube's characterization of her statement to Mastrogiacomo as a complaint, it appears she never asked anyone from Hadco to dispel the rumor.[2]  Instead, Dube herself informed others of the rumor.  Furthermore, the rumor could be seen as gender neutral.  It did, after all, concern both Dube and Mastrogiacomo and could be interpreted as affecting both equally.  Although it could be inferred, based on a common stereotype, that because Dube was a

_____

[2]Although Dube now characterizes the rumors as humiliating, there is no indication that she felt humiliated at the time they were made.  Similarly, Dube's hostile environment claim is not supported by her statement that, although it did not bother her at the time, in retrospect she found Mastrogiacomo's suggestion that she accompany him on a business trip to be offensive.  If the statement was not offensive to her at the time, it cannot be said to have created a subjectively hostile work environment.  Furthermore, even if she had established that this suggestion was subjectively offensive, it is not the type of comment that is severe or pervasive enough to create an objectively hostile work environment.

14

low-level employee and Mastrogiacomo was her superior, she had used the alleged relationship to advance her position in the business world, this inference alone cannot save the claim. The court concludes that no rational jury could find that the rumor that Dube was having an affair with Mastrogiacomo created "'an environment that a reasonable person would find hostile or abusive' and [was] subjectively perceived by the victim to be abusive." Lattimore, supra, 99 F.3d at 463 (quoting Harris, supra, 510 U.S. at 21).

References to an escort service made after Dube went to dinner with the Japanese men present a closer case.[3] The term "escort service," which all involved have agreed implies prostitution, was repeated to Dube in an accusatory manner by her superiors in the context of their investigation of the dinner. The conversations Dube had with Debbie Simpson and Diane Riel-Piatt also gave Dube the impression that her job was on the line. These statements clearly were embarrassing and disturbing to Dube. The rumor also apparently contributed to Dube's termination. See Dube Deposition at 158 (stating Mastrogiacomo told her "there is too many things that were going on with rumors

_____

[3]Dube's claim that the references to a wet t-shirt contest were sexual harassment merits little discussion. There is no allegation that Dube was aware of such statements. Naturally, a rumor of which Dube was not aware could not create a hostile or abusive environment.

15

and he didn't want me to work there anymore").  The court believes that a reasonable jury could find that Dube was subjected to an objectively hostile environment.  Furthermore, there is enough evidence in this case to create a material issue of fact over whether her supervisor's actions were based on gender.  Although it was certainly within Hadco's prerogative to investigate Dube's activities with the Japanese clients, the manner in which Hadco's employees conducted the investigation, including accusations and the use of the derogatory term "escort service," could support a claim of hostility based on sex.  Dube can argue tenably that the rumors, and her supervisors' readiness to take them seriously, were based on sexual stereotyping.  See Galdieri-Ambrosini v. National Realty Dev., 136 F.3d 276, 289 (2d Cir. 1998) ("Evidence of sexual stereotyping may provide proof that an employment decision or an abusive environment was based on gender.").  Dube's evidence, including Diane Riel-Piatt's direct statements, indicates that a similarly situated male employee may have been treated differently.  The court, therefore, will allow this claim to proceed.

### 4. The Defamation Claim

Plaintiff's defamation claim alleges that "statements made by management and other employees of Hadco that Ms. [Dube] was a

16

prostitute defamed Ms. [Dube]." Complaint ¶ 23. Defendant assumes this rather vague accusation refers to Don Torisi's reference to an "escort service" made to Fiona Peatrie at the bar. Although the court does not agree that because Ms. Peatrie was Dube's friend she is not a third person for purposes of publication, see PROSSER AND KEETON ON TORTS 798 (5th ed. 1984) ("[Publication] may be made to a member of plaintiff's family . . . or to the plaintiff's agent or employee."), it does agree that the statement was not made within the scope of Torisi's employment and that Hadco therefore cannot be held liable for it.

Under New Hampshire law, an employer may be held liable under the theory of respondeat superior "[i]f the act causing the injury is connected with or grows out of the service the servant is doing . . . ." Richard v. Amoskeag Mfg. Co., 79 N.H. 380, 384, 109 A. 88, 91 (1919). More recently, the New Hampshire Supreme Court adopted section 228 of the RESTATEMENT (SECOND) OF AGENCY and noted, "behavior within the scope of employment must be actuated at least in part by an object to serve the employer, RESTATEMENT, supra §228(1)(c), and this view accords with an earlier statement of the New Hampshire rule that the act must have been performed in 'furtherance' of the employer's business." Daigle v. City of Portsmouth, 129 N.H. 561, 580, 534 A.2d 689, 699 (1987). Section 228 of the Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> > (b) it occurs substantially within the authorized time and space limits;
> > (c) it is actuated, at least in part, by a purpose to serve the master; and
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond authorized time or space limits, or too little actuated by a purpose to serve the master.

RESTATEMENT (SECOND) AGENCY § 228.

The context of the statement in this case, which was made after work as Torisi was having a drink following a game of golf, does not support the contention that it was made in the scope of employment. Furthermore, in her opposition to the motion for summary judgment, Dube does not even attempt to argue that this statement was made within the scope of Torisi's employment.

Instead, Dube alleges that

> statements made by numerous Hadco managers that Ms. Dube was running an escort service were widely published. . . . Ms. Riel-Piatt told Ms. Dube that she had heard Ms. Dube was running an escort service. Diane Simpson heard the statements and took them seriously enough to ask Ms. Dube whether she had . . . slept with the Japanese visitors. . . . Riel-Piatt told Ms. Dube that she was looked upon as a "tramp" and that her reputation had suffered. . . . Mastrogiacomo told Ms. Dube . . . he had heard that Ms. Dube was running an escort service. . . .

18

. . . .

> Hadco managers also widely circulated the statement that Ms. Dube had been involved in a "wet T-shirt contest."

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment at 22-23.

These allegations are insufficient to support a defamation claim. The United States Court of Appeals for the First Circuit has held that "the plaintiff . . . is limited to [her] complaint in defining the scope of the alleged defamation." Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 729 n.6 (1st Cir.), cert. denied, 564 U.S. 974 (1992). Although the Federal Rules of Civil Procedure do not require plaintiffs to quote the alleged defamatory language in the complaint, they do require the complaint to provide sufficient notice to alert the defendant to "the precise language challenged as defamatory . . . ." Id.

> The fact that [plaintiff] failed to recite the exact language spoken is not fatal to her defamation claim. At the very least, however, [plaintiff] must identify which defendants made false and defamatory statements. This [plaintiff] has not done. [Plaintiff] 'failed to allege who made the allegedly libelous statements, to whom they were made, and where.' The complaint does not notify any of the individual defendants of what defamatory remarks he or she allegedly made.

Schibursky, v. IBM, 820 F. Supp. 1169, 1181 (D. Minn. 1993) (citations omitted). Dube's allegation that managers referred to

19

her as a prostitute clearly did not put the defendant on notice that she was complaining about statements regarding a wet t-shirt contest. See Complaint ¶ 23. Furthermore, although discovery is now complete, Dube still has not identified specifically who made the statements to whom and in what context. See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment at 23 ("Hadco managers . . . widely circulated the statement that Ms. Dube had been involved in a 'wet T-shirt contest.'").

Similarly, plaintiff's allegations regarding statements about an escort service either identify statements made to Dube, not published to a third person, or fail to identify who made the statements.[4] "To establish defamation, there must be evidence that a defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118, 635 A.2d 487, 492 (1993). Plaintiff's allegations fail to provide a showing sufficient to establish the essential elements of a defamation claim against Hadco. See Croslan v. Housing Auth., 974 F. Supp. 161, 171 (D.

_____

[4]Although the statement made by Don Torisi is sufficiently identified, as discussed above, there is no support for the proposition that it was made in the scope of employment such that Hadco could be held liable for it.

20

Conn. 1997) ("[P]laintiff bears the burden of identifying the particular statements that she claims are defamatory. General assertions regarding speakers and subject matter are not sufficient to present a disputed issue of material fact regarding the actual defamatory statements that were made."). Accordingly, Hadco's request for summary judgment on Count II must be granted.

5. <u>Wrongful Discharge</u>

Hadco requests summary judgment on Dube's wrongful discharge claim. To the extent Dube's wrongful discharge is based upon her contention that her termination was motivated by gender discrimination, she fails to state a claim. An allegation of discriminatory firing clearly states a claim under Title VII; the First Circuit has stated that under New Hampshire Law "the existence of [a statutory] remedy . . . precludes . . . a common law claim for wrongful discharge." <u>Smith v. F.W. Morse & Co.</u>, 76 F.3d 413, 429 (1st Cir. 1996).

Under New Hampshire law, an employer cannot terminate an at-will employee for a reason that violates public policy. <u>See</u> <u>Monge v. Beebe Rubber Co.</u>, 114 N.H. 130, 133, 316 A.2d 549, 551 (1974). "To have a valid claim for wrongful termination, the plaintiff must show: 'one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee

21

performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn.'" Wenners v. Great State Beverages, 140 N.H. 100, 103, 663 A.2d 623, 625 (1995) (quoting Short v. School Admin. Unit 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992)), cert. denied, 516 U.S. 1119 (1996). In this case Dube, apparently cognizant of the fact that such an argument could not pass the straight-face test, has not argued in her opposition to summary judgment that an identifiable public policy exists that would encourage her to go out to dinner with Japanese businessmen. Thus the court hereby grants summary judgment on Dube's Count III.

### Conclusion

For the abovementioned reasons, defendant's motion for partial summary judgment (document no. 13) is denied in part and granted in part.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

February 4, 1999

cc:   James W. Donchess, Esq.
      Jennifer A. Demaree, Esq.
      Martha V. Gordon, Esq.